# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**                                    **CASE NO. 3:17cr86-MCR**

**WALI EBBIN RASHEE ROSS**
also known as WALI IBN ROSS
also known as WAL EBBIN
RASHEE ROSS**,**

     **Defendant.**

_____/

## ORDER

     Defendant Wali Ebbin Rashee Ross was charged by Superseding Indictment

with being a felon in possession of a firearm and ammunition,[1] 18 U.S.C. §§ 922(g),

924(a); knowingly possessing with intent to distribute a controlled substance,

namely, heroin, 21 U.S.C. §§ 841(a), 841(b)(1)(C); and two counts of forfeiture, one

---

[1] The Superseding Indictment lists the following prior felony charges: (1) a November 21, 2000 conviction for possession of a controlled substance, (2) a November 9, 2001 conviction for manufacturing or delivering a controlled substance with intent to sell, (3) an April 12, 2011 conviction for possession of a firearm by a convicted felon, and (4) a December 21, 2011, conviction for possession with intent to sell marijuana.

pertaining to firearms, 18 U.S.C. § 924(d), and one pertaining to the proceeds and property obtained by a controlled substance violation, 18 U.S.C. § 21 U.C. § 853. Pending is Defendant's Motion to Suppress Evidence, seeking to exclude all items seized from a hotel room after Defendant fled from law enforcement officers. ECF No. 24. The Court held an evidentiary hearing on the matter on October 30, 2017. Having fully considered the arguments, the law, and the record, the Court finds that the motion is due to be denied.

**Background**

On July 21, 2017, a United States Marshal Service ("USMS") regional fugitive task force headed by Deputy Nichole Dugan, USMS, attempted to arrest Ross on three outstanding warrants for state law crimes, namely, trafficking hydrocodone, failure to appear on a charge of battery with prior convictions, and failure to appear on a charge of possession of controlled substances, each of which is a felony. The task force gathered at the Baymont Inn and Suites in Pensacola, Florida, on information that Ross was staying at the hotel. At the evidentiary hearing, Special Agent Jeremy England, Naval Criminal Investigative Service, testified that he participated in the USMS task force, along with five to ten other task

force officers. Special Agent England testified that on arriving at the hotel, the officers learned that Ross was not a registered guest, and consequently, the task force set up surveillance of the hotel from various positions, not knowing what room Ross might be in. England parked in the lot of an adjacent hotel and observed the north face of the Baymont Inn and Suites from a tree line along the western border of the hotel parking lot. *See* Gov't Ex. 3 (layout of the hotel and surrounding area). England said that at the time, he understood Ross was a fugitive felon with a history of violence and drug crimes.[2] He therefore felt Ross presented a danger.

At around 9:00 or 9:30 a.m., Special Agent England observed an individual matching Ross's description exit a room on the first floor of the hotel, later determined to be Room 113. He was seen walking toward a truck located in the parking lot to the west of the hotel, in the direction where England was positioned for surveillance, before returning briefly to the room.[3] Ross came out again within seconds and resumed walking toward the truck, but he ran when he recognized a law

---

[2] Ross's prior convictions included drug trafficking and being a felon in possession of a firearm, *see* Note 1, and the charges he was being arrested on included felony failure to appear on a charge of battery with prior convictions.

[3] According to England, Ross appeared to have forgotten something, such as his keys.

Case No. 3:17cr86-MCR

enforcement vehicle. Ross jumped a chain link fence and ran north toward Interstate 10, making it difficult for officers to pursue him. England said he tried to chase Ross on foot, but he was too far behind and unable to climb the fence because he was wearing heavy body armor. England saw Ross run onto the first of two eastbound lanes of Interstate 10 traffic, north of the hotel. At that point, the task force officers all pursued Ross in vehicles, trying to reach the other side of the Interstate to intercept him. On reaching the opposite side, some officers began searching again on foot, but they had lost sight of Ross.

Special Agent England and his partner, Task Force Officer William Wheeler, made a radio call to other officers to determine whether anyone had stayed behind to monitor the hotel room. Because no officers had stayed behind, and Ross was out of sight, England believed there was a chance that he had doubled back to the hotel after the officers gave chase, so they returned to the hotel within ten minutes of when they left. The truck was still in the parking lot, and the door to Room 113 was closed. England monitored the room while Wheeler obtained a key from the hotel staff at the front desk, along with a copy of the registration for Room 113, which was for one night and registered under a different name. England testified that he and

Wheeler entered the room using the key and without knocking, believing that Ross or someone else could be inside and could be a threat to them, stating, "we didn't know who we would encounter on the inside." England said that it is protocol for the task force to make a tactical entry to confirm that no one dangerous is hiding when executing an arrest warrant for a suspect with a history of violent crime. England and Wheeler quickly established that neither Ross nor anyone else was in the room, however, on leaving the room, England noticed a white but transparent plastic grocery-type bag with the outline of a firearm clearly visible. *See* Gov't. Ex. 4, 5 (photographs of the room and plastic bag). England reached into the plastic bag and retrieved the firearm, knowing it was contraband because Ross was a felon. The officers touched nothing else in the room at that time. USMS Deputy Dugan then called the Special Agents of the Bureau of Alcohol, Firearms, Tobacco, and Explosives ("ATF") to investigate, and England and Wheeler maintained surveillance of the room until the ATF agents arrived.

ATF Special Agent Kimberly Suhi arrived shortly before 11:00 a.m., and Special Agent England turned the firearm over to her. No search of the room was conducted until after the hotel's 11:00 a.m. checkout time had passed. At that time,

Case No. 3:17cr86-MCR

Special Agent Suhi obtained consent to search the room from the hotel manager, Karen Nelson. Special Agent Suhi photographed the room and conducted a search with a special agent trainee. ATF seized items of contraband they discovered in the room and returned the personal items (including a gaming system) to hotel management.[4]

Karen Nelson, the manager at the Baymont Inn and Suites, testified that on July 21, 2017, she arrived at work at approximately 9:00 or 9:30 a.m., and two officers were already present outside Room 113, guarding the entry with the door open. She inquired as to what was happening and learned that Ross had fled from the hotel. Nelson stayed around the area and did not see anyone enter the room until after checkout time. Nelson testified that at 11:00 a.m., when it was clear that no guest in the room had requested a late checkout time, she consented to the officers searching the room. According to Nelson, if it appeared that guests were still in the room at 11:00, the front desk attendant might sometimes give them a courtesy call to ask whether a late checkout was requested before entering the room. Otherwise,

---

[4] The investigative report indicates that ATF seized a cellular telephone, a Crown Royal bag containing a digital scale, cigars, and various controlled substances in baggies, including over 12 grams of a substance containing heroin. The USMS had already seized the firearm by the time ATF arrived.

if no late checkout had been requested, it was assumed that all guests had left prior to the agreed checkout time, and hotel staff would enter the room after 11:00 a.m. to clean. Nelson testified that hotel policy required staff to inventory and store any personal items left in a room after checkout time and required management to call law enforcement if staff discovered a firearm or drugs in a room. According to Nelson, someone had called later in the day on July 21, 2017, inquiring about property that had been left in the room.

Defendant argues that all evidence seized by law enforcement from Room 113 of the Baymont Inn and Suites on July 21, 2017, should be suppressed because the initial entry by England and Wheeler was an invalid protective sweep, and thus the firearm was illegally seized, and the subsequent ATF search by consent was tainted as "fruit of the poisonous tree" by the prior unlawful sweep.

**Discussion**

The Fourth Amendment protects persons "against unreasonable searches and seizures." U.S. Const. amend. IV. A search without a warrant is "presumptively unreasonable," unless it meets one of the "carefully drawn exceptions." *United States v. Yeary*, 740 F.3d 569, 579 (11th Cir. 2014) (internal quotations omitted).

Fourth Amendment principles generally authorize police to enter a suspect's home for the limited purpose of executing a valid arrest warrant, as long as police have a reasonable belief that the suspect will be found there.[5] *Payton v. New York*, 445 U.S. 573, 603 (1980) ("[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within."); *Steagald v. United States*, 451 U.S. 204, 214-15, n.7 (1981) (same); *United States v. Williams*, 871 F.3d 1197, 1201 (11th Cir. 2017) (entry into a residence to execute an arrest warrant requires a reasonable belief that (1) the location is the suspect's dwelling, and (2) that the suspect is within at the time of entry). A suspect cannot thwart an otherwise proper arrest by the act of retreating into her house.[6] *See United*

---

[5] The Fourth Amendment also requires that officers knock and announce their presence before breaking in to execute an arrest warrant, which has been codified by statute stating, an officer with a warrant may forcibly enter a suspect's home to execute an arrest warrant if no one answers after the officers knock and announce their presence. *See* 18 U.S.C. § 3109. However, entry due to exigent circumstances or in hot pursuit are exceptions to the knock and announce requirement.

[6] On the other hand, an arrest warrant for a suspect does not itself justify entry into or search of a third party's home; consent or exigent circumstances, including hot pursuit, must exist to justify entry into a third-party's dwelling without consent. *See Steagald*, 451 U.S. at 211-22 ("If the person is in a third party's home, absent consent to enter, a search warrant for the residence must be obtained in addition to the arrest warrant.").

*States v. Santana*, 427 U.S. 38, 41–43 (1976) (stating a suspect may not defeat arrest which has been set in motion in a public place "by the expedient of escaping to a private place"); *see also Warden v. Hayden*, 387 U.S. 294 (1967) (police in hot pursuit of fleeing suspect may make a warrantless entry to arrest and seize weapons). It is well-settled that a hotel room can be "the object of Fourth Amendment protection as much as a home or an office." *Hoffa v. United States*, 385 U.S. 293, 301 (1966). To determine whether entry to execute an arrest warrant was reasonable, courts consider the totality of the circumstances known to the officers at the time together with "common sense factors," including the reasonable inferences and presumptions drawn by the officers. *Williams*, 871 F.3d at 1201.

Once lawfully inside, either to execute an arrest warrant or by virtue of exigent circumstances, which include the "hot pursuit" of a suspect, *see Santana*, 427 U.S. at 42–43 (stating officers may enter a premises even without a warrant when they are in hot pursuit of a fleeing suspect), the officers may conduct a protective sweep for their safety and the safety of others. *See Williams*, 871 F.3d at 1201; *see also Maryland v. Buie*, 494 U.S. 325, 332-33 (1990) (concluding a protective sweep is

permitted incident to an arrest). Also, if the initial entry is lawful, the officers may seize any contraband that is found in plain view.[7] *Williams*, 871 F.3d at 1201.

As the Eleventh Circuit has acknowledged, determining whether a protective sweep is lawful is a "difficult question," which requires a court to balance "two deeply important interests—the lives of law enforcement officers and the constitutional right of the people to be secure in their homes under the Fourth Amendment." *United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012) (quoting *United States v. Delancy*, 502 F.3d 1297, 1307 (11th Cir. 2007)). A protective sweep must be justified by "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer's belief in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Yeary*, 740 F.3d at 580 (quoting *Buie*, 494 U.S. at 334). Also, a protective sweep is limited in scope, involving "only a 'cursory inspection of those spaces where a person may be found," and the sweep must end "when the

---

[7] The plain view doctrine permits warrantless seizure of an object if (1) the officer could plainly see it from a place where he was lawfully present, and (2) "the incriminating nature of the item is immediately apparent." *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006).

reasonable suspicion of danger is dispelled.'" *Williams*, 871 F.3d at 1201 (quoting *Buie*, 494 U.S. at 335-36).

As a threshold matter, the Court finds Special Agent England a credible witness. Determining on these facts whether the protective sweep is valid, however, is not an easy task. England was attempting to execute an arrest warrant. He was in hot pursuit of Ross after Ross fled and said he knew that Ross was a potential danger with a history of violent crime and three outstanding felony arrest warrants. All of the officers had lost sight of Ross when he fled, and it was confirmed that he had occupied Room 113 and had left his truck behind. England explained that, although Ross had started running across a busy interstate, he suspected Ross might have returned to his hotel room after the officers left. Because the officers were still in hot pursuit of a fleeing felon, the Court finds it was reasonable in that situation for England to believe that Ross had returned to the hotel room, possibly to retrieve belongings and his truck. The arrest warrant granted officers a limited ability to enter to effectuate the arrest on the officer's reasonable belief that Ross was in the room. *See Payton,* 445 U.S. at 603. Also, because another name was on the

registration, the officers had reason to be concerned that someone else might be in the room as well.

Ross argues that the facts were not enough to justify entry, relying in part on *United States v. Scott*, 517 F. App'x 647, 648-49 (11th Cir. 2013) (unpublished),[8] in which a protective sweep of a home was found invalid for lack of articulable facts. In *Scott*, the defendant was arrested outside his home, and the court found the record devoid of any articulable facts or reasonable suspicion that any dangerous individuals were present inside the home. The Eleventh Circuit in *Scott* noted that the investigating officers' "lack of information" about whether dangerous individuals were present could not substitute for "articulable facts" to justify a protective sweep.[9] *Id.* at 649 (citing *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999)). In the present case, however, the Court credits England's testimony that entry was for the purpose of executing the arrest warrant based on his

---

[8] While unpublished opinions are not considered binding, they may be considered as persuasive authority. See 11th Cir. R. 36-2; *see also United States v. Futrell*, 209 F.3d 1286, 1289 (11th Cir. 2000).

[9] The Supreme Court in *Buie* likened a protective sweep to a *Terry* stop and cautioned against allowing sweeps based on a "mere inchoate and unparticularized suspicion or hunch." 494 U.S. at 332 (quoting *Terry v.* Ohio, 392 U.S. 1, 27 (1968) (authorizing a limited pat down for weapons based on specific articulable facts giving rise to a reasonable suspicion)).

reasonable belief that Ross may have returned to the hotel room while it was not under surveillance, which alone would have given the officers authority to enter his hotel room to look for him and arrest him pursuant to the warrant.[10] *See Payton*, 445 U.S. at 603.

Additionally, the chase and the fact that the officers lost sight of Ross presented exigent circumstances.[11] *See United States v. Standridge,* 810 F.3d 1034, 1037 (11th Cir. 1987) (even in a warrantless arrest situation, officers were found to have conducted a lawful sweep of a motel room, justified by "hot pursuit"). In *Standridge*, a critical fact allowing the officers to enter the hotel room for a warrantless arrest was that the officers had not followed the suspect when he went into the motel and had not constantly watched the room, making it uncertain whether he was alone. The court acknowledged that "[e]very arrest must be presumed to

---

[10] When the officers first arrived, they did not know which hotel room Ross occupied, but by the time England and Wheeler entered the room, there was no doubt that Ross had been in Room 113, though it was registered in a different name.

[11] Considerations of exigent circumstances include: (1) the gravity or violent nature of the office charged; (2) whether there is a reasonable belief that the suspect is armed; (3) whether there is probable cause to believe the suspect committed the crime; (4) a "strong reason" to believe the suspect is within the premises; and (5) a likelihood that delay could cause the escape of the suspect, destruction of evidence, or jeopardize the safety of officers and the public. *United States v. Standridge*, 810 F.3d 1034, 1037 (11th Cir. 1987).

Case No. 3:17cr86-MCR

present a risk of danger to the arresting officer." *Id.* at 1037 & n.2. Here, England

and Wheeler were in "hot pursuit" with a warrant and a genuine concern over officer

safety, knowing that Ross was on the run and that his truck was still at the hotel,

reasonably believing that Ross might have returned while the room was not under

surveillance, and knowing that Ross had a history of violent crime.[12] Given all the

circumstances, the Court finds that the officers' entry into the hotel room was

justified by the arrest warrant, hot pursuit, a reasonable belief that Ross had returned,

and the resulting exigent circumstances.

Once lawfully inside the room, the officers conducted a search that was quick

and limited in scope to finding Ross or anyone else who might be hiding in the room.

It was coincidental that England saw the outline of a firearm in a mostly clear plastic

bag beside the bed on his way out of the room. The plastic grocery-type bag was

white but still transparent enough that items could be seen through it. The Court

finds that the outline of a firearm in the bag would have been plainly visible, as

England testified. Having thus seen the firearm in plain view through the bag on a

---

[12] Despite the fact that the officers in this case did not have articulable facts indicating a reason to believe Ross was presently armed, and they took time to obtain a key from front desk, they knew Ross was a fugitive with a history of violence and had physically evaded arrest by fleeing minutes earlier, making this a volatile situation.

Case No. 3:17cr86-MCR

table by the bed during the protective sweep, England was justified in seizing the firearm. *See United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 1991) (under the plain view doctrine, an officer lawfully present may seize an item in plain view if its incriminating nature is apparent).

Even assuming that the protective sweep was not justified by the arrest warrant and exigent circumstances, the hotel management gave law enforcement lawful third-party consent to search after the 11:00 a.m. checkout time lapsed. *See e.g., United States v. Mercer*, 541 F.3d 1070, 1074-75 (11th Cir. 2008) (finding valid a warrantless search of motel room even before checkout time because based on the officer's reasonable belief that the motel manager had terminated the room agreement and thus had authority to consent to search). The Eleventh Circuit instructs courts to consider three factors when determining whether a voluntary consent was tainted by a prior illegal entry or search: (1) the temporal proximity between the alleged illegal conduct and the consent, (2) whether any intervening circumstances were present, and (3) "the purpose and flagrancy of the official misconduct." *Scott*, 517 F. App'x at 650 (quoting *United States v. Santa*, 236 F.3d 662, 677 (11th Cir. 2000)); *see also Wong Sun v. United States*, 371 U.S. 471, 488

(1963) ("We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." Rather, the question is whether, given that illegality, the evidence was "come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.").

When the hotel checkout time lapsed, with no extended checkout having been requested and no additional day paid for, it became clear that Ross had abandoned the room and lost all privacy interests in the room.[13] It is equally clear on this record in light of Nelson's testimony that at that time, hotel staff ordinarily would have entered the room to clean it as a matter of course, and, because the firearm was in plain view, hotel policy would have required management to notify the police. Applying the factors to determine if the illegal entry was purged by the subsequent

---

[13] Cases from other circuits confirm that a hotel guest no longer has a reasonable expectation of privacy in a room if the guest unlawfully stays past the designated check-out time. *See, e.g. United States v. Rahme,* 813 F.2d 31, 34 (2d Cir.1987) ("[W]hen a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room or in any articles therein of which the hotel lawfully takes possession."); *United States v. Croft,* 429 F.2d 884, 887 (10th Cir. 1970) (same and also stating that after the rental period, "the guest has completely lost his right to use the room and any privacy associated with it" and that thereafter, "[t]he manager of the motel may then freely enter the room"). Ross had not paid for a second night and had no established history with this hotel acquiescing to a late departure. Furthermore, under Florida law, a hotel operator may remove anyone who stays in a public hotel room beyond the agreed checkout time. Fla. Stat. § 509.141(1).

consent, the Court notes that the hotel manager's consent to search was given to the ATF after the checkout time had passed; thus, it was somewhat temporally removed from the allegedly unlawful entry. The passing of checkout time itself presents a significant intervening circumstance in this case because of its implications on Ross's Fourth Amendment rights in the room, which lapsed at 11:00 a.m., the agreed checkout time, with no agreement to extend the stay. Finally, the officer's prior conduct of entering the room and discovering the firearm while in pursuit of a fleeing felon in the area cannot be said to be of such "flagrancy" that it cannot be cured by the third-party consent; at most, the circumstances show that England's belief was wrong and that his attempt to execute the arrest warrant in the hotel room was unsuccessful, but the Court credits his testimony that he genuinely intended to arrest Ross and ensure the safety of the officers and the public from a potential threat.

Ross also argues that the hotel manager's consent to an ATF search does not purge the taint of the prior unlawful entry because the ATF would not have been called but for the initial illegal entry and seizure of a firearm. Although it is true that in the absence of discovering the firearm, the USMS would not have called *ATF agents* to investigate, it does not logically follow that without discovery of the

firearm, the USMS would not have requested consent in the ordinary course of pursuing any leads that might have been left in the room. England and Wheeler kept constant surveillance over the hotel room after returning, waiting for the 11:00 a.m. checkout time to pass so that a valid search by consent could be conducted. It is most likely that, as a routine part of their ongoing attempt to find Ross, the officers nevertheless would have continued to wait until checkout time to request the hotel's consent to search the room, as in fact they did. Because Ross had occupied Room 113, had fled from that room, and was still actively evading arrest, there simply is no reason to believe that the USMS would have given up this potential lead by not requesting management's consent to search after the 11:00 a.m. checkout time, nor is there any reason to believe that the hotel manager was so influenced by the firearm that she would not have given the same consent to the USMS as she gave the ATF. The Court finds that the but-for connection between the prior entry and firearm discovery and the third-party consent does not automatically render the evidence inadmissible under *Wong Sun*. Instead, the hotel manager's voluntary consent to search was not tainted by the prior entry and discovery of a firearm due largely to

the intervening circumstances of the expiration of Ross's privacy interests in the room and the ongoing search for him.

Ross also relies on a First Circuit case, *United States v. Delgado-Perez*, 867 F.2d 244 (1st Cir. 2017), for his argument that the sweep was illegal and the taint was not cured by the subsequent consent. The Court finds this case factually distinguishable. In *Delgado-Perez*, the First Circuit found the initial protective sweep of a residence unjustified where officers executed an arrest warrant for the defendant outside of his home, there were no facts suggesting anyone else was in the residence, and the police nonetheless conducted a protective sweep of the inside of the home and a search in which they seized a firearm. Subsequently, the defendant consented to a search. The First Circuit determined that the protective sweep was unlawful, based on a lack of information instead of the requisite "articulable facts" that a dangerous person was inside the residence and found that the firearm seizure (fruit of the unlawful sweep) was not purged of taint by the defendant's subsequent consent. *Id.* at 255-56. The court explained that the defendant's consent was tightly bound by a causal link to the unlawful sweep because he only gave consent knowing that the officers had already conducted a sweep and found his firearm. In Ross's

case, by contrast, the consent was given by a disinterested third party, which significantly alters the analysis. Ross's lack of a privacy interest after checkout and the hotel manager's knowledge of the chase leaves no concern that she gave consent only because they had already discovered a firearm. Thus, the Court declines to apply the reasoning of *Delgado-Perez*.

The Government argues that, even assuming the protective sweep was invalid and the taint not sufficiently purged by the subsequent consent, the independent source doctrine applies on these facts, making the evidence admissible. The Court agrees. The independent source doctrine allows for the admission of evidence despite an unlawful protective sweep if the evidence was "obtained from a lawful source that is independent of any Fourth Amendment violation." *Noriega*, 676 F.3d at 1260; *see also Nix v. Williams*, 467 U.S. 431, 443 (1984) (stating this doctrine allows admission of evidence "discovered by means wholly independent of any constitutional violation"). The independent source doctrine applies to avoid the consequence of the exclusionary rule putting officers in a worse position than they would have been in absent the constitutional violation, and the Supreme Court has endorsed the inevitable discovery rule on the same rationale. *See Williams*, 467 U.S.

at 443-44. Ordinarily, the independent source doctrine is applied in a context where a search warrant was obtained based on an illegal entry, and the court is required to consider whether the warrant application demonstrated probable cause without consideration of the evidence obtained during the illegal sweep, and if so, whether the officer still would have sought the warrant without that evidence.[14] *Noriega*, 676 F.3d at 1260-61. Similarly, the inevitable discovery doctrine allows the admission of evidence if the government establishes "a reasonable probability that the evidence in question would have been discovered by lawful means," and that the lawful means which made the discovery inevitable were being actively pursued prior to the illegal conduct of the officer. *See United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015). This "active pursuit" means that the police would have discovered the evidence "by virtue of ordinary investigations of evidence or leads already in their possession." *Id.*

---

[14] More specifically, the Eleventh Circuit describes the "independent source doctrine" as a two-step process in the warrant situation: first, any information gained during the arguably illegal search is excised from the warrant application to determine whether the remainder of the information supports probable cause for a search, and second, if it does, the court determines whether the officer's decision to seek the warrant was prompted by what was seen during the arguably illegal search. *See United States v. Bush*, 727 F.3d 1308, 1316 (11th Cir. 2013). The court explained that if the search would have been authorized without the information gained during the illegal search, the evidence is admissible. *Id.*

Citing the independent source doctrine, the Government argues that because no one requested a late checkout or returned to Room 113, the hotel staff in the ordinary course would have entered the room to clean, discovered the firearm, and, pursuant to hotel policy as Nelson testified, they would have then called the police and consented to the search. Therefore, the evidence still would have been obtained through a lawful alternative source independent of any Fourth Amendment violation. This scenario does not fit neatly within the independent source doctrine because no search warrant was obtained using information from the allegedly illegal sweep; *cf. Noriega*, 767 F.3d at 1260; instead, the officers sought and obtained consent from the hotel manager. Nonetheless, the same rationale applies—excising the firearm from the request for consent to search, as discussed above, there is a reasonable probability that the officers would have still requested and received consent to search after the 11:00 a.m. checkout time, even without the allegedly unlawful sweep. Also, the leads already in the officers' possession (i.e., the warrants for Ross's arrest and knowledge that Ross had stayed in this room and fled from it unexpectedly on seeing law enforcement) would have been pursued in the ordinary course of the investigation as the officers continued to search for Ross, making it highly probable

that the firearm would have been inevitably discovered, either during a lawful search or through the ordinary hotel procedures.  The Court agrees with the Government that the evidence is admissible.

Accordingly, Defendant's Motion to Suppress, ECF No. 24, is **DENIED**.

**DONE AND ORDERED** this 7th day of November, 2017.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**